United States District Court
Southern District of Texas
Houston Division

Daniels Health Sciences, LLC,

    Plaintiff,

v.

Vascular Health Sciences, LLC,

    Defendant.

Civil Action: 4:12-cv-01896

Jury Demanded

## Plaintiff's Original Complaint and Application for Injunctive Relief

Daniels Health Sciences, LLC files its Original Complaint and Application for Injunctive Relief as follows:

### Statement

1.    Bruce A. Daniels, M.D., is Board Certified Internist and an award-winning cardiovascular disease physician. He has worked for more than two-decades researching and patenting compounds designed to improve artery health and cellular function.  One of those compounds is "Provasca."[1]

2.    Three years ago, Dr. Daniels invited his brother, David Daniels, to work with him on the marketing side of Provasca, so that Dr. Daniels could focus on his scientific research through his company, Plaintiff Daniels Health Sciences.  David Daniels

---

[1] Provasca is a "nutraceutical," the commonly-used term for dietary supplements that are not regulated by the FDA as drugs.

then recruited Bob Long to help with the marketing of Provasca through their company, Defendant Vascular Health Sciences.

3.     After almost two full years of negotiations between Daniels Health and Vascular Health about how Dr. Daniels' Provasca would be marketed and who would own the fruits of Dr. Daniels' intellectual labor, Vascular Health has stolen Dr. Daniels' intellectual property and confidential information.

4.     Vascular Health has been actively marketing Provasca in commerce over the internet and at conferences.  Even worse, Vascular Health is about to start actually *selling* Provasca, which will work immediate irreparable harm—not only on Daniels Health—but also on the underlying science's credibility with top-notch physicians, researchers, and collaborators.

<u>Parties</u>

5.     Plaintiff, Daniels Health Sciences, LLC, is a limited liability company organized under Delaware law, and it has its principal place of business in Harris County, Texas.

6.     Defendant, Vascular Health Sciences, LLC, is a is a limited liability company organized under Delaware law, and it has its principal place of business at 947 South 500 East, Suite 250, American Fork, Utah 84003.  It may be served with process through its Delaware registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  It may also be served with process through its Utah registered agent, Bob Long, at 7 South Lone Peak Drive, Alpine, Utah 84004, or wherever he may be found.

## Jurisdiction & Venue

7.     This Court has personal jurisdiction over Defendant because Defendant has voluntarily consented to personal jurisdiction in Texas.  In addition, Defendant has sufficient minimum contacts with the Texas such that exercising personal jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

8.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs are asserting claims under the Lanham Act, which specifically confers jurisdiction on this Court to grant injunctive relief under 15 U.S.C. § 1116.  The Court has supplemental jurisdiction over Plaintiffs' other claims under 28 U.S.C. § 1367.

9.     Venue is proper in this Court 28 U.S.C. § 1391(b)(3) because Defendant is subject to the personal jurisdiction of the Court and there is no other district in which the case can be brought under 28 U.S.C. § 1391.  In addition, Defendant has contractually agreed to venue in Harris County, Texas.

## Facts[2]

10.     Bruce A. Daniels, M.D. is an award-winning internist and cardiovascular disease physician.  He has been board certified by the American Board of Internal Medicine since 1978.   When he lost a dear friend to a heart attack in 1984, he began a 25-year quest to improve blood clot resistance and to save lives.

11.     Dr. Daniels has worked for more than two decades researching and patenting compounds that have potential therapeutic benefits for artery health and cellular function.  Dr. Daniels' research led him to the identification of orally bioactive,

---

[2] The facts of this pleading are supported by the Verification of Bruce A. Daniels, M.D., which is attached as Exhibit A.

sulfated polysaccharides as therapeutic agents for vascular health, one of which is a nutraceutical[3] product marketed as "Provasca."

12.    With the addition of the Provasca mark, and representing the results of Dr. Daniels' years of scientific research, his intellectual property includes five patents,[4] eight patent applications,[5] the common law Provasca mark,[6] and the Provasca registered 3,058,068 mark[7] (collectively "Daniels IP").

13.    Based on his proprietary research and grounded in the Daniels IP, Dr. Daniels formed Daniels Health Sciences, LLC, a company dedicated to continued research of this field of study as well as licensing the Daniels IP for a variety of product applications.  In the beginning, however, the focus was Provasca.

14.    Provasca is an oral supplement intended for daily intake containing a patented compound of a specific seaweed extract and the amino acid L-Arginine, designed to maintain arterial health as part of an overall cardiovascular health regimen.

---

[3] The term "nutraceutical" is used in commerce to describe dietary supplements that are not regulated by the FDA as drugs.

[4] U.S. Patents 7,214,383; 7,022,682; 6,797,705; 6,495,530; and 6,255,296.

[5] U.S. Patent Applications 11/635,882; 11/546,677; 10/794,892; 10/841,101; 10/795,560; 10/383,888; 10/320,309; and 10/299,506.

[6] Provasca common law mark:



[7] U.S. Registration 3,058,068. On May 14, 2012, Vascular Health has filed an action to cancel the '068 Provasca mark with the U.S. Trademark Trial and Appeal Board (ESTTA 472340).  Vascular Health's petition is without merit, and Daniels Health will file an appropriate response by the applicable deadline.

15.     In 2000, Dr. Daniels, alongside management and investors, formed a company called Endomatrix, to market and sell Provasca.  After raising roughly $6 million in seed capital from predominantly high net worth investors, the company was unable to achieve commercial success and filed bankruptcy in December 2007.[8]  In May 2008, Dr. Daniels bought the Daniels IP back from Endomatrix during the bankruptcy.[9]

16.     In 2009, Dr. Daniels consulted his brother, David Daniels, to get input on putting together the next iteration of a business plan to sell and market Provasca.  As part of this effort, David Daniels recruited his former business colleague, Bob Long, and Dr. Daniels, for his part, enlisted his daughter, Thea Daniels Kocher, to join the effort.

17.     At the time, the plan was to form two entities, Daniels Health and Vascular Health Sciences.  Daniels Health would own the intellectual property and focus on research, development, and expanding Provasca's application to other fields of use.  For its part, Vascular Health Sciences would focus on marketing and sales of the Provasca nutraceutical products, through a licensing agreement with Daniels Health.

18.     After almost one year of limited progress, Dr. Daniels became concerned about the team's ability to effectively achieve its vision.  Dr. Daniels was particularly concerned with the team's progress because neither David Daniels nor Bob Long had any experience in nutraceuticals, or even in healthcare.

---

[8] The Endomatrix chapter 7 proceeding was styled:  Case No. 07-11591, *In re. Endomatrix, Inc.*; In the United States Bankruptcy Court for the Northern District of California, Santa Rosa Division. On September 18, 2009, the bankruptcy court signed the Final Decree in the Endomatrix bankruptcy.

[9] The bankruptcy court signed an order approving the sale of the intellectual property to Dr. Daniels on April 8, 2008.

19.     Dr. Daniels' concern grew when David Daniels and Bob Long refused to even discuss involving a company with established expertise in the field, and they refused to bring in a former FDA official as a consultant in the approval process.

20.     Further, Dr. Daniels was equally concerned about the confidentiality of Daniels Health intellectual property, and was concerned about the disclosure of proprietary information and trade secrets in the context of Vascular Health trying to raise capital on the promise of the intellectual property owned and developed by Daniels Health.

21.     In July 2011, Daniels Health and Vascular Health Sciences came to mutual agreement on a term sheet that outlined the relationship between the two companies and the framework for the licensing agreement ("Term Sheet").[10]  Importantly, the Term Sheet was heavily scrutinized by both parties, and required dozens of emails and phone calls to come to agreement on terms suitable for both sides.

22.     Under the Term Sheet, Vascular Health would raise at least $7 million from investors, and if it was successful, Daniels Health and Vascular Health would execute a licensing agreement.  In exchange for Vascular Health's fundraising and marketing efforts, Daniels Health would give Vascular Health Sciences an "exclusive worldwide license to market, manufacture, advertise, and sell" dietary supplements and food additives that use the Daniels IP, which specifically included licensing the Provasca trademark and patents from Daniels Health.[11]

---

[10] A true and correct copy of the term sheet is attached as Exhibit B and incorporated by reference.

[11] Ex. B:  Term Sheet at 1.

23.    Although the Term Sheet wasn't binding, Vascular Health Sciences did recognize that it wasn't entitled to use the Daniels IP until it had a license to do so.

24.    In September 2011, before Vascular Health Sciences began its fundraising efforts in earnest, Dr. Daniels signed a Confidentiality and Non-Disclosure Agreement with Vascular Health Sciences ("NDA").[12]  As permitted under the NDA, Dr. Daniels has assigned his rights and obligations under the NDA to Daniels Health.[13]

25.    The NDA protects Dr. Daniels's intellectual property and confidential information, both of which it broadly defines:

> "Confidential Information" shall mean all confidential or proprietary written, recorded, electronic or oral information or data (including but not limited to financial, organizational, corporate, research, developmental, engineering, environmental, manufacturing, operational, technical, marketing, sales, operating, performance, cost, business and process information or data, know-how, inventions (whether or not patents have been applied for in the United States or anywhere in the world), trade secrets, and computer programming and other software and software techniques) provided (whether such confidentiality or proprietary status is indicated orally or, whether or not the specific words "confidential" or "proprietary" are used) to VHS or any of its Representatives and Affiliates by Daniels or any of his Representatives and Affiliates. All analyses, compilations, studies, memoranda, notes or other documents, records or data (in whatever form maintained, whether documentary, computer or other electronic storage or otherwise) prepared by VHS and/or any of its Representatives and Affiliates which contain or otherwise reflect or are generated from information and documents provided by Daniels shall be deemed Confidential Information as defined herein.

---

[12] A true and correct copy of the NDA is attached as Exhibit * and incorporated by reference.

[13] Ex. C: NDA at 4, Section 9(c).

*The NDA also prohibits Vascular Health from using the confidential information and the Daniels IP for anything not related to the contemplated deal with Daniels Health* ("Proposed Transaction").[14]

26.    Throughout the discussions, Dr. Daniels was concerned principally with protecting trade secrets.  The NDA took weeks to negotiate, highlighting the importance of keeping this information proprietary.

27.    David Daniels was intimately involved in negotiating this document, including key details such as what constitutes Confidential Information.  In fact, David Daniels exchanged dozens of emails over a two month period on the topic of the NDA alone.  As such, there is no uncertainty as to ownership or contents of the IP that Dr. Daniels was seeking to protect.

28.    For the next several months, Vascular Health continued its fundraising efforts.  To that end, Daniels Health allowed Vascular Health to use the Provasca mark for fundraising purposes but only to further the Proposed Transaction.

29.    Vascular Health often requested scientific presentation materials from Daniels Health, which were provided in a timely manner.  Daniels Health was clear that the materials were intended for high net worth individuals and other similar potential investors, not for public consumption or large corporations, venture capital firms, or other individuals or entities who might have an interest in—as well as the financial wherewithal and scientific capability—to steal the Daniels IP.  To protect itself, Daniels Health required an executed NDA for every meeting.

---

[14] Ex. C: NDA at 2, Section 2(b).

30.     At the same time it was protecting its Provasca mark and confidential information, Daniels Health continued its efforts to strengthen its patent protection, engaging new patent attorneys and filing another provisional patent based on current research.

31.     At the same time Vascular Health Sciences was purportedly raising money per the Term Sheet, Daniels Health and Vascular Health Sciences were negotiating the licensing agreement.  Although progress was slow, as far as Daniels Health knew, both sides were still on track to close the deal in early 2012.

32.     Then, on February 28, out of the blue, Vascular Health Sciences informed Daniels Health that the deal was off, by email:

> Hi Bruce,
>
> After an in-depth competitive analysis, VHS has decided not to enter into a license agreement with DHS.
>
> I am available this evening after 8:00pm if you want to discuss.
>
> Sorry it didn't work out.
>
> DD[15]

What the email didn't convey, Daniels Health would soon find out.

33.     Daniels Health would later learn that Vascular Health had filed an application with the USPTO to register the Provasca mark *the day before* it notified Daniels Health that the deal was off.  In addition, Vascular Health re-registered the

---

[15] Ex. D:  Email from David Daniels to Dr. Bruce Daniels of February 28, 2012.

www.provasca.com domain in its own name, as opposed to returning it to Daniels Health.

34.     A month later, Daniels Health learned that Vascular Health was planning on presenting at a conference to discuss Provasca.  After hearing from VHS that the licensing deal had been canceled, Daniels Health began to re-acquire the physical product.  Due to suspicious behavior on the Vascular Health side (e.g. continuing to use "Provasca" email accounts, updating emails with a new logo, and uncharacteristically offering to do costly favors such as de-capsule the Provasca formula at their cost), Daniels Health began to perform online research to understand how Vascular Health was moving forward.

35.     Simple internet searches led to an Age Management Conference agenda for May 2012 featuring Vascular Health's Dr. DeSilva and David Daniels speaking on "The Glycocalyx: A New Paradigm in Arterial Health"—a concept they know about only because of Dr. Daniels—and a presentation called "Wake Up to Provasca."  Although Daniels Health had authorized Vascular Health to participate in a similar conference in November 2011, Vascular Health didn't have Daniels Health's approval for the May 2012 presentations.

36.     Dr. DeSilva and David Daniels indeed presented the Provasca-related materials at the conference, and Daniels Health found out more about the scope of their activity when they ordered the conference video for proof.

37.     As a result of Vascular Health's activities, Daniels Health has lost more than two years on the patents and has been unable to reach out to collaborative partners and other funding sources.  In addition, the confidential information that Dr. Daniels intended

for a very small group is being discussed publicly, destroying the value of the information and causing confusion in the marketplace and the investor pool.

38.     Vascular Health is also making several false statements in the marketplace that are causing irreparable injury to Daniels Health by diluting the value and integrity of the Provasca mark, as well as the two decades that Dr. Daniels has spent developing the science behind the product.

39.     The damage being caused by Vascular Health's misappropriation of the Daniels IP and infringement will be far-reaching.  For example, by making claims that Provasca can do things that haven't been proven, Vascular Health is weakening Daniels Health's ability to get research grants from the National Institutes of Health.

40.     Furthermore, statements on Vascular Health's website including "Protect the arteries that protect your heart,"[16] imply disease prevention, which is likely an unapproved health claim under the Food and Drug Administration's regulations governing dietary supplements.[17]  Were the FDA to take action against Provasca, it would be even more difficult for Daniels Health to cultivate the science.

41.     It isn't hyperbole to state that the science behind Provasca could generate a sea change in arterial health and heart attack prevention.  Vascular Health's profit-driven conduct is putting all of those possibilities in jeopardy.

---

[16] Ex. E: Vascular Health website image.

[17] *See* 21 C.F.R. 101.14(a)(1) & (c); 21 C.F.R. 101.93(f).

## Causes of Action

### Count One—Breach of Contract

42.     Vascular Health is liable to Daniels Health for breach of contract.  The NDA obligated Vascular Health to keep confidential information confidential, and it prevented Vascular Health from using the confidential information for anything other than the Proposed Transaction.

43.     Vascular Health has materially breached its obligations under the NDA by disclosing the confidential information and using it for Vascular Health's own benefit.

44.     As a proximate result of those breaches, Daniels Health has suffered significant injuries, which are difficult to determine at this time.  Therefore, Daniels Health seeks injunctive relief.

45.     Under Chapter 38 of the Texas Civil Practice & Remedies Code, Daniels Health is entitled to recover its reasonable and necessary attorney fees.

### Count Two—Misappropriation of Trade-Secrets

46.     Vascular Health is liable to Plaintiffs for trade-secret misappropriation. Daniels Health owned proprietary trade-secret information it used in its business.  That information includes but not limited to business methods, chemical formulas and ingredients, technical information, customer lists, marketing strategies, business plans, know-how, and intellectual property.

47.     Daniels Health took reasonable steps to protect its trade-secrets, including requiring Vascular Health to sign the NDA and requiring a confidentiality agreement be signed before any of the trade-secrets were disclosed to potential investors.

48.     Vascular Health has used and disclosed the trade-secret information in violation of the NDA, and after acquiring the trade-secret information with unquestionable notice that disclosure was improper.

49.     As a result of Vascular Health's misappropriation, Daniels Health has been damaged, but those damages are difficult to quantify with reasonable certainty. Therefore, Daniels Health seeks injunctive relief.

### Count Three—Trademark Infringement

50.     Vascular Health is liable to Daniels Health for trademark infringement under 15 U.S.C. § 1114.  Daniels Health is the senior user of the Provasca Marks, and it is the rightful owner of the Provasca '068 Mark.

51.     Vascular Health's use of the Provasca Mark and the domain www.provasca.com are likely to confuse potential customers into thinking that Vascular Health's goods and services are affiliated with Daniels Health.

52.     Under 15 U.S.C. § 1116, Daniels Health is entitled to injunctive relief prohibiting Vascular Health's use of the Provasca Mark.

53.     Under 15 U.S.C. § 1117, because of Vascular Health's knowing infringement, Daniels Health is entitled to recover from Vascular Health:  (1) Vascular Health's profits attributable to the infringement; (2) damages Daniels Health has suffered; (3) the costs of bringing this action; and (4) up to three times the amount of Daniels Health's damages.

54.     Because this is an exceptional case, Daniels Health seeks to recover its reasonable attorney fees.

## Count Four—Common Law Infringement

55.     Vascular Health is liable to Daniels Health for common law trademark infringement.  Daniels Health is the senior user of the Provasca Marks, and it has acquired a common law exclusive right to use them in the market, which is nationwide.

56.     Vascular Health's use of the Provasca Mark and the domain www.provasca.com are likely to confuse potential customers into thinking that Vascular Health's goods and services are affiliated with Daniels Health.

57.     Under the principles of equity, Daniels Health is entitled to injunctive relief prohibiting Vascular Health's use of the Provasca Mark and to recover its reasonable attorney fees and costs.

## Count Five—Declaration Under 15 U.S.C. § 1119

58.     This Court has the authority to "determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."[18]

59.     Daniels Health asks the Court for an order directing the U.S. Patent and Trademark Office to register the '068 Mark to Daniels Health and to dismiss Vascular Health's petition to cancel.

## Count Six—False Advertising

60.     Vascular Health is liable to Daniels Health for false advertising under the Lanham Act.  Specifically, Vascular Health has made false and misleading statements of

---

[18] 15 U.S.C. § 1119.

fact in commerce that are likely to cause confusion between Vascular Health's products and Daniels Health's products in violation of 15 U.S.C. § 1125(a)(1).

61.     In commercial advertising and promotions, Vascular Health has misrepresented the nature, characteristics, and qualities, both of its products and of Daniels Health's products in violation of 15 U.S.C. § 1125(a)(2).

62.     Vascular Health registered and has used the www.provasca.com domain name in bad faith in violation of 15 U.S.C. § 1125(d).

63.     Under 15 U.S.C. § 1116, Daniels Health is entitled to injunctive relief prohibiting Vascular Health's use of the Provasca Mark.

64.     In the alternative, under 15 U.S.C. § 1117, because of Vascular Health's knowing infringement, Daniels Health is entitled to recover from Vascular Health:  (1) Vascular Health's profits attributable to the infringement; (2) damages Daniels Health has suffered; (3) the costs of bringing this action; and (4) up to three times the amount of Daniels Health's damages.

65.     Because this is an exceptional case, Daniels Health seeks to recover its reasonable attorney fees.

### Count Seven—Violations of the Texas Theft Liability Act

66.     Vascular Health is liable to Daniels Health under the Texas Theft Liability Act.  Vascular Health has wrongfully misappropriated Daniels Health's property with the intent to deprive Daniels Health of that property in violation of Sections 31.03 and 31.04 of the Texas Penal Code.

67.     Therefore, Vascular Health is liable to Daniels Health under the Texas Theft Liability Act, and Daniels Health is entitled to recover exemplary damages and its reasonable and necessary attorney fees and costs.

### Application for Temporary Restraining Order, Preliminary Injunction & Permanent Injunction

Pursuant to Federal Rule of Civil Procedure Rule 65, Daniels Health applies for a temporary restraining order, a preliminary injunction, and a permanent as follows:

68.     Daniels Health is entitled to a temporary restraining order and a preliminary injunction because it has shown that:  (1) it has a substantial likelihood of success on the merits; (2) it faces a substantial threat of irreparable injury; (3) that the threatened injury outweighs any harm that injunctive relief may work on Vascular Health; and (4) granting injunctive relief will not disserve the public interest.[19]

69.     The threat of irreparable harm is imminent.  Vascular Health's website has recently been updated, and it now allows the general public to pre-order "Provasca."[20]  If the Court doesn't immediately restrain Vascular Health from continuing its infringement

---

[19]   *See, e.g.*, *Canal Authority of State of Florida v. Callaway*, 489 F. 2d 567, 572–73 (5th Cir. 1974) (en banc); *see also TGI Friday's Inc. v. Great Nw. Restaurants, Inc.*, 652 F. Supp. 2d 763, 767 (N.D. Tex. 2009).

[20]   Ex. F: Vascular Health website's "pre-order" advertisement.

and misappropriation of confidential information, the value of the Provasca marks, and the supporting science will suffer tremendously.

70.     Furthermore, considering Vascular Health's brazen conduct and disregard for Daniels Health's confidential information as indicated above, the Court should issue a temporary restraining order without notice to Vascular Health.  Furthermore, because Vascular Health has indicated that it has begun accepting money from the market and will begin shipping the infringing product in the very near future, there is an extreme risk that Daniels Health will suffer the irreparable injury before Vascular Health can be heard in opposition.[21]

**Status quo.**

71.     As to the temporary restraining order, Daniels Health is entitled to have the last actual, peaceable, non-contested status that preceded this controversy continue until the Court can conduct a hearing on Daniels Health's application for a preliminary injunction.[22] Here, the last peaceable, non-contested status was when Vascular Health wasn't using Daniels Health's confidential information and the Provasca marks without permission.

**Substantial likelihood of success on the merits.**

72.     Daniels Health has a substantial likelihood of success on the merits. Based on the facts Daniels Health has alleged (and to which Dr. Daniels has sworn), Daniels

---

[21]   *See* Fed. R. Civ. P. 65(b)(1).

[22]   *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 300, 395 (1981).

Health will probably, when the Court renders its final judgment and decree, obtain an injunction that permanently bars the Vascular Health's offensive conduct.

73.     Vascular Health is liable to Daniels Health for trademark infringement because: (1) Vascular Health is using a copy or colorable imitation of Daniels Health's Provasca mark; (2) without Daniels Health's consent; (3) in interstate commerce; (4) in connection with sales and advertising of nutraceutical products; and (5) Vascular Health's use of the Provasca mark is likely to cause confusion, mistake, or to deceive.[23]

74.     Vascular Health is liable to Daniels Health for breach of contract.  The NDA prohibits Vascular Health from using the Daniels IP or the confidential information. Vascular Health is using both in material breach of the agreement.

**Substantial threat of irreparable harm.**

75.     As Vascular Health has recognized in the NDA, "money damages would not be a sufficient remedy for any breach of [Vascular Health's] or its Representatives' confidentiality obligations and that Daniels [Health] will be entitled to seek specific injunctive relief as a remedy for any such breach."[24]

76.     Furthermore, Daniels Health has no adequate legal remedy.  Damages are inadequate. Although Daniels Health can recover damages for Vascular Health's wrongful acts, those damages can't be calculated to a certainty.[25] What is clear is that the wrongful acts of Vascular Health have effectively halted commercial or collaborative progress of

---

[23]     *See Mississippi Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985).

[24]     Ex. C: NDA at 3, Section 6.

[25]     *See TGI Friday's Inc. v. Great Northwest Restaurants, Inc.*, 652 F. Supp. 2d 763, (N.D. Tex. 2009).

Daniels Health since such actions suggest that anyone can use the intellectual property with relative impunity, and consequently it would be difficult if not impossible for Daniels Health to make substantial progress under such conditions.

77.    The possibility that the Provasca mark's value could be diluted by Vascular Health's premature marketing, Daniels Health's loss of control over the Provasca mark, the likelihood that future funding for the science will be lost by Vascular Health's unproven claims, and the uncertain loss of revenue from sales of the product all show that payment of money alone wouldn't be adequate to cure the damage that Vascular Health has caused.[26]

**Balance of harms.**

78.    The threatened harm to Daniels Health greatly outweighs the potential harm to Vascular Health.  If Vascular Health isn't enjoined, the Provasca mark will be diluted, Daniels Health will lose control of its Provasca mark, the ability to license, sell, or joint venture with another party will be substantially and irreversibly lost, and the lack of research funding will gut Dr. Daniels' ability to develop the science.

79.    Conversely, any potential harm to Vascular Health will be minor in comparison, for at least two reasons.  First, the Confidential Information and the Daniels IP belongs to Daniels Health, so Vascular Health doesn't have the right to profit from them in the first place.   Second, there is a general presumption that, when on party

---

[26]    *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386-87 (7th Cir. 1984) (Posner, J.).

infringes upon another's mark, the threatened harm to the senior user outweighs the harm to the junior user.[27]

**Bond.**

80.   Although the equities of this case weigh against requiring security on the restraint requested, if the Court requires a bond, Daniels Health is willing to post one.

**Request for preliminary injunction.**

81.   Daniels Health asks that the Court set its request for a preliminary injunction for hearing.

**Request for permanent injunction.**

82.   Daniels Health asks that the Court permanently enjoin Vascular Health's conduct in its final decree after a full trial on the merits.

## Conditions Precedent

83.   All conditions precedent to Daniels Health's right to recover have been performed, have occurred, or are otherwise excused.

## Jury Demand

84.   Daniels Health demands a trial by jury, and it has paid the appropriate fee to the Clerk.

## Conclusion & Prayer

Plaintiffs ask that Defendant be cited to appear, that Plaintiffs recover all damages as set forth in this pleading, that Defendant be enjoined as set forth in this pleading, and

---

[27] *See TGI Friday's*, 652 F. Supp. 2d at 773.

that the Court award Plaintiff all other relief, in law or in equity, to which it is justly entitled.

Respectfully submitted,

By: /s/ Jared G. LeBlanc by permission
    H. Ronald Welsh
    Texas Bar No. 21167600
    Federal ID 10137
    rwelsh@welshchapoton.com

Plaintiff's Attorney-in-Charge

Of Counsel:

John E. Chapoton, Jr.
Texas Bar 04137010
Federal ID 13688
jchapoton@welshchapoton.com

Jared G. LeBlanc
Texas Bar No. 24046279
Federal ID 575408
jleblanc@welshchapoton.com

Michael W. Twomey
Texas Bar No. 24070776
S.D. Tex. Bar No. 608043
mtwomey@welshchapoton.com

Welsh Chapoton LLP
8 Greenway Plaza, Suite 1150
Houston, Texas 77046
713-554-7770
713-554-7771 – Fax